**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Tawnya Leah Hobart

    v.                                     Civil No. 11-cv-151-PB

Michael J. Astrue, Commissioner,
Social Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Tawnya Hobart moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons that follow, I recommend affirmance of the Commissioner's decision, as announced by the Administrative Law Judge ("ALJ").

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB decisions); see also 42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of review for SSI decisions).  However, the court "must uphold a denial of social security . . . benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from

the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 14.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Hobart was born in 1978.  At her hearing, she testified that she had received treatment for various mental-health issues since her teens.  She also has a history of substance abuse, for which she has received treatment.  She testified that she had worked at a variety of different jobs, several of which she walked away from due to her inability to cope with the stress of

3

the workplace.  She last worked in April of 2007, and claims an onset date of March 20, 2008, which is the day after she became clean and sober.

Hobart entered treatment at Genesis Behavioral Health Center ("Genesis") in May of 2008.  At Genesis, she has received psychiatric evaluations, pharmacological evaluation and management, individual counseling, group counseling, case management, and vocational counseling.  At her hearing, in September of 2010, Hobart testified that she was then being treated with Wellbutrin, Celexa, Trazadone, and Serapo, and had, in the past, been given prescriptions for Paxil, Prozac, Risperdal, Remeron, Xanex, Klonopin, Zoloft, and Cymbalta.

In January of 2009, Hobart was seen by Dr. Lawrence Mazur, a psychiatrist at Genesis.  He listed her chief complaint as follows: "This 30-year-old single, white unemployed mother of a 12-year-old child who is presently dealing with co-morbid depression and polysubstance dependence problems was seen for psychiatric evaluation and consideration of a new antidepressant trial."  Administrative Transcript (hereinafter "Tr.") 343.  Dr. Mazur's psychiatric evaluation includes the following axial diagnosis:

> Axis I:   1.   Major depressive disorder recurrent and moderate (296.32).

        2.    Polysubstance dependence (opioids, alcohol, cocaine), presently in abstinence (304.80).

        3.    Possible PTSD (309.81).

Axis II:  Borderline traits noted in the past.

Axis III: History of right ankle fracture, exogenous obesity, hypertension.

Axis IV:  Unemployed, shared custody of only child, hoping to avoid SA relapse.

Axis V:   GAF estimated at 49.[1]

Tr. 344.  Dr. Mazur concluded his psychiatric evaluation with the following recommendations:

> The patient is provided with a 1-month prescription for fluoxetine 20 mg q. a.m. with 3 refills.  She will continue with her substance abuse and individual counseling, continue to receive the above-mentioned prescribed medications, including Suboxone, through her PCP and will follow up with this office in 2 months' time to review her mental status and the fluoxetine efficacy.  Decision should be made then whether or not to continue that trial and if so with a titration or consider some other antidepressant trial (patient hoping at that time to have some type of insurance).

Id.

On February 17, 2009, Dr. Mazur examined Hobart a second time and completed a psychiatric evaluation in support of her application for aid to the permanently and totally disabled from

---

[1] The parties agree that "[a] GAF of 49 shows serious symptoms in social and occupational functioning."  Joint Statement (doc. no. 13), at 3 (citing Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)).

the State of New Hampshire.  In that evaluation, he offered the following diagnostic impressions: (1) major depressive disorder, recurrent, non-psychotic; (2) history of polysubstance dependence in 11-month abstinence; (3) possible PTSD; and (4) borderline traits noted.  See Tr. 490.  Based in part on his mental status examination, Dr. Mazur determined that Hobart had a marked degree of functional loss with regard to daily activities and social interactions,[2] a constant degree of functional loss with regard to task performance,[3] and a repeated degree of functional loss with regard to stress reaction.[4]  In his prognosis, Dr. Mazur stated that Hobart was "very motivated 'wants a life again, will do whatever it takes.'"  Id.  He predicted her general level of functioning, following recommended treatment, to be "moderately limited," estimated a possible return to work within two to four years, but rated the probability of such a return as "uncertain . . . given both co-morbid problems & recessionary economy."  Id.  He also made the following additional remarks: "Needs extensive psychotherapy,

---

[2] Those ratings were selected from the following continuum: none, slight, moderate, marked, extreme.  See Tr. 489.

[3] That rating was selected from the following continuum: never, seldom, often, frequent, constant.  See Tr. 489.

[4] That rating was selected from the following continuum: never, once or twice, repeated, continual.  See Tr. 489

vocational rehabilitation, demonstrable drug-abstinence with no relapse." Id.

On March 26, 2009, Dr. Rexford Burnette performed a consultative examination of Hobart, and subsequently completed a mental-health evaluation report.  He made the following findings regarding her then-current level of functioning: (1) activities of daily living: "There are some Limitations, but claimant generally functions well," Tr. 402; (2) social functioning: "There are Limitations, but claimant still functions satisfactorily," Tr. 403; (3) understanding and remembering instructions: "Limitations are absent or minimal," id.; (4) concentration and task completion: "Limitations are absent or minimal," id.; and (5) reaction to stress: "There are some Limitations, but claimant generally functions well," Tr. 404. In support of his first finding, Dr. Burnette provided the following narrative:

> Ms. Hobart seems to be devoting a lot of her time
> during the day to her recovery from substance
> dependence, and she feels that she is too impatient,
> irritable, and anxious to work at this time.  However,
> she seems to be managing the various activities of her
> daily living well enough in spite of these complaints
> and mainly identifies her knee pain/limitations as the
> factor that mainly affects her daily life at this
> time.  She is living with her mother and stepfather
> who support her and pay her bills, which she feels she
> has mismanaged during her years of substance abuse.

Tr. 402.  Similar narratives follow each of Dr. Burnette's other
four findings.

Dr. Burnette rendered the following diagnoses: (1)
depressive disorder not otherwise specified, in partial
remission; and (2) polysubstance dependence, sustained full
remission, in treatment.  He ruled out posttraumatic stress
disorder, due to insufficient evidence, and deferred a diagnosis
of borderline personality (despite detecting some indicative
traits).  Finally, Dr. Burnette gave the following prognosis:

> Ms. Hobart acknowledges that she had had problems in
> the past staying in treatment and making persistent
> changes, but she seems motivated to try hard at this
> time.  Her polysubstance dependence appeared to be
> relatively long-standing and will be prone to relapse.
> Her depression appears to be responding to treatment
> but there is insufficient evidence to determine how
> much.

Id.

On September 8, 2010, Hobart's therapist at Genesis,
Elizabeth Bean, completed a mental residual functional capacity
("RFC") assessment of Hobart.  See Tr. 795-800.  Under the
category of understanding and memory, Ms. Bean found moderate
limitations in two abilities[5] and no significant limitation in

---

[5] Those abilities are: (1) remembering locations and work-
like procedures; and (2) understanding and remembering detailed
instructions.

one ability.[6]  Under the category of sustained concentration and

persistence, Ms. Bean found marked limitations in four

abilities,[7] moderate limitations in three abilities,[8] and no

significant limitation in one ability.[9]  Under the category of

social interactions, Ms. Bean found a marked limitation in one

ability[10] and moderate limitations in four others.[11]  Under the

category of adaptation, Ms. Bean found marked limitations in two

---

[6] That ability is understanding and remembering very short
and simple instructions.

[7] Those abilities are: (1) maintaining attention and
concentration for extended periods; (2) performing activities
within a schedule, maintaining regular attendance, and being
punctual within customary tolerances; (3) working in
coordination with or proximity to others without being
distracted by them; and (4) completing a normal workday and
workweek without interruptions from psychologically based
symptoms and performing at a consistent pace without an
unreasonable number and length of rest periods.

[8] Those abilities are: (1) carrying out detailed
instructions; (2) sustaining an ordinary routine without special
supervision; and (3) making simple work-related decisions.

[9] That ability is carrying out very short and simple
instructions.

[10] That ability is getting along with co-workers or peers
without distracting them or exhibiting behavioral extremes.

[11] Those abilities are: (1) interacting appropriately with
the general public; (2) asking simple questions or requesting
assistance; (3) accepting instructions and responding
appropriately to criticism from supervisors; and (4) maintaining
socially appropriate behavior and adhering to basic standards of
neatness and cleanliness.

abilities[12] and no significant limitations in two others.[13]  The
mental RFC assessment form Ms. Bean completed asked her to
provide a "[d]etailed explanation of the degree of limitation
for each category . . . in the 'comments' section below each
category."  Tr. 795.  Ms. Bean provided a single comment:

> Tawnya and I completed this assessment together.
> Evaluation is based on my experience with Tawnya,
> records from previous providers at Genesis Behavioral
> Health and input from Tawnya as to how she is
> functioning currently.

Id.

After conducting a hearing on Hobart's claim, the ALJ
issued a decision that includes the following findings of fact
and conclusions of law:

> 3. The claimant has the following severe impairment:
> depressive disorder (20 CFR 404.1520(c) and
> 416.920(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals one of the listed impairments in 20 CFR Part
> 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
> 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.
>
> . . . .

----

[12] Those abilities are: (1) responding appropriately to
changes in the work setting; and (2) traveling in unfamiliar
places and using public transportation.

[13] Those abilities are: (1) being aware of normal hazards
and taking appropriate precautions; and (2) setting realistic
goals and making plans independently of others.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is capable of performing jobs with simple instructions.

. . . .

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . . .

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 14, 15, 16, 19, 20.

In determining Hobart's RFC, the ALJ was not persuaded by Dr. Mazur's conclusion, gave great weight to Dr. Burnette's opinion, did not give significant weight to Ms. Bean's opinion, and gave substantial weight to "the administrative findings of fact made by the state agency physicians,"[14] Tr. 19.

───────────────

[14] The ALJ referred to "opinions . . . from non-examining and non-treating expert sources," Tr. 19, but he did not further identify the opinions to which he was referring.  While it is not clear, the ALJ may have been referring to a psychiatric review technique completed by Dr. William Jamieson in April of

**Discussion**

According to Hobart, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) failed to give appropriate weight to the opinions of the treating sources who have provided her with mental-health care, i.e., Dr. Mazur and Ms. Bean; (2) improperly relied on the Social Security Administration's medical-vocational guidelines; and (3) failed to obtain testimony from a vocational expert.

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The only question in this case is whether Hobart was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

---

2008.  In determining the severity of Hobart's depression, Dr. Jamieson determined that she had no episodes of decompensation, no difficulties in maintaining concentration, persistence or pace, and mild difficulties in maintaining social functioning and performing activities of daily living.  See Tr. 416.

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A)

(setting out a similar definition of disability for determining

eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if his [her] physical or mental
> impairment or impairments are of such severity that he
> [she] is not only unable to do his [her] previous work
> but cannot, considering his [her] age, education, and
> work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the
> immediate area in which he [she] lives, or whether a
> specific job vacancy exists for him [her], or whether
> he [she] would be hired if he [she] applied for work.
> . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

To determine whether a claimant is disabled for the purpose

of determining eligibility for either DIB or SSI benefits, an

ALJ is required to employ a five-step process.  See 20 C.F.R. §§

404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the

conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

    Hobart bears the burden of proving that she is disabled.

See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must do so

by a preponderance of the evidence.  See Mandziej v. Chater, 944

F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530

F. Supp. 808, 810-11) (D. Mass. 1982)).  However,

    [o]nce the [claimant] has met his or her burden at
    Step 4 to show that he or she is unable to do past
    work due to the significant limitation, the
    Commissioner then has the burden at Step 5 of coming
    forward with evidence of specific jobs in the national
    economy that the [claimant] can still perform.  Arocho
    v. Sec'y of Health & Human Servs., 670 F.2d 374, 375
    (1st Cir. 1982).  If the [claimant's] limitations are
    exclusively exertional, then the Commissioner can meet
    her burden through the use of a chart contained in the
    Social Security regulations.  20 C.F.R. § 416.969;
    Medical-Vocational Guidelines, 20 C.F.R. pt. 404,
    subpt. P, App. 2, tables 1-3 (2001), cited in 20
    C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458
    (1983). "The Grid," as it is known, consists of a
    matrix of the [claimant's] exertional capacity, age,
    education, and work experience.  If the facts of the
    [claimant's] situation fit within the Grid's
    categories, the Grid "directs a conclusion as to
    whether the individual is or is not disabled."  20
    C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited
    in 20 C.F.R. § 416.969.  However, if the claimant has

14

> nonexertional limitations (such as mental, sensory, or
> skin impairments, or environmental restrictions such
> as an inability to tolerate dust, id. § 200(e)) that
> restrict his [or her] ability to perform jobs he [or
> she] would otherwise be capable of performing, then
> the Grid is only a "framework to guide [the]
> decision," 20 C.F.R. § 416.969a(d) (2001).  See also
> Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)
> (discussing use of Grid when applicant has
> nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's
> subjective claims of pain and disability as supported
> by the testimony of the plaintiff or other witness;
> and (3) the plaintiff's educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

    B. Hobart's Arguments

     Hobart advances two interrelated arguments.  First, she

argues that by improperly discounting the opinions of her

treating sources, the ALJ incorrectly determined her RFC.  She

then argues that because the ALJ relied on a flawed RFC, he

erred by failing to elicit testimony from a vocational expert

and then relying on the medical-vocational guidelines to find

that there are jobs in the national economy she is capable of

performing.  The Commissioner disagrees, categorically.

15

## 1. Weight Given to the Treating-Source Opinions

Hobart's principal argument is that the ALJ erred in determining the relative amount of weight to give the opinions of Dr. Mazur, Dr. Burnette, and Ms. Bean.  More specifically, she argues that the ALJ should have given greater weight than he did to the opinions of her treating sources, Dr. Mazur and Ms. Bean.  The court does not agree.  The following analysis begins with the relevant legal principles and then turns to the opinions at issue.

## a. Legal Principles

The Commissioner and, by extension, an ALJ, must consider and evaluate all the medical opinions in a claimant's case record.  See 20 C.F.R. §§ 404.1527(b) & (d) and 416.927(b) & (d).  The relevant regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant'] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2) and 416.927(c)(2).

Turning to the mechanics of the opinion-evaluation process, "[i]f any of the evidence in [a claimant's] case record,

including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the Commissioner] will weigh all of the evidence."  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).  As a general matter, the Commissioner gives more weight to opinions from examining sources than to opinions from non-examining sources, and the greatest weight of all to opinions from treating sources.  See 20 C.F.R. §§ 404.1527(d) and 416.927(d).  When determining how much weight to give the opinion of a treating source, the Commissioner must consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence the medical source presents in support of his or her opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) other factors which tend to support or contradict the opinion.  See 20 C.F.R. §§ 404.1527(d) and 416.927(d).

No matter what determination the Commissioner makes regarding the weight to be given a treating source's opinion, the Commissioner must "always give good reasons in [his] notice of . . . decision for the weight [he gives a claimant's] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  "Giving 'good reasons' means providing 'specific

reasons' that will allow 'subsequent reviewers [to know] . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"   Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996)).  Not only must the adjudicator's reasons be specific, they must also be supportable, see Soto—Cedeño v. Astrue, 380 F. App'x 1, 4 (1st Cir. 2010), and offer a rationale that could be accepted by a reasonable mind, see Lema v. Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21, 2011).

### b. Dr. Mazur's Opinion

    The ALJ was not persuaded by Dr. Mazur's opinion.  He declined to give that opinion substantial weight because "the doctor's contemporaneous treatment records fail[ed] to support such an elevated level of disability."  Tr. 18.  According to Hobart, "the length, frequency, nature and extent of the treatment relationship support the reliability of the Genesis providers' opinions."  Cl.'s Mem. of Law (doc. no. 10-1), at 5. Hobart further argues that those providers' opinions are consistent with the extensive record of her treatment at Genesis.  The Commissioner, in turn, contends that the ALJ correctly determined that Dr. Mazur's opinion was not supported

18

by his treatment records and supports that contention by pointing to specific findings incorporated into Dr. Mazur's two psychiatric evaluations.  The Commissioner further argues that Dr. Mazur's conclusion that Hobart could return to work in two to four years was not entitled to any particular deference, as that was an opinion on an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e) and 416.927(e).  While the record in this case might have supported a decision to give Dr. Mazur's opinion somewhat more weight than the ALJ give it, there is no basis for ruling that the ALJ erred with respect to the weight he gave that opinion.  See Tsarelka, 842 F.2d at 535.

As a preliminary matter, the court notes that Hobart's argument is based, at least to some extent, on lumping Dr. Mazur, Ms. Bean, and all the other Genesis providers into a single unit and then, at least implicitly, ascribing her treatment history with the entire institution to each individual provider.  Indeed, Hobart's substantive argument is directed to the opinions of the Genesis providers collectively rather than to the two opinions at issue individually.  It is certainly appropriate to treat Hobert's Genesis treatment collectively when determining whether a particular treating source's opinion is consistent with record as a whole, under 20 C.F.R. §§ 404.1527(d)(4) and 416.927(d)(4).  However, when assessing the

length, nature, and extent of a claimant's treatment relationship with a provider who has given a medical opinion, under 20 C.F.R. §§ 404.1527(d)(2)(i) & (ii) and 416.927(d)(2)(i) & (ii), the focus must be limited to the treatment provided by the source who gave the opinion.

That said, the court does not agree with Hobart that the length, frequency, nature, and extent of her treatment relationship with Dr. Mazur provides a strong basis for giving that opinion substantial weight.  At the time he rendered his opinion, Dr. Mazur had seen Hobart just twice, which limits the amount of weight his opinion should be accorded.  See 20 C.F.R. §§ 404.1527(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.")

The weight a treating-source opinion should be accorded also depends on "the treatment the source has provided."  20 C.F.R. §§ 1527(d)(2)(ii) 416.927(d)(2)(ii).  The purpose of Hobart's first visit with Dr. Mazur was to evaluate her for participation in a drug trial.  The purpose of the second visit was to secure the opinion that, in Hobart's view, the ALJ failed

to properly credit.[15]  There is no evidence that Hobart received
psychotherapy or any other form of treatment from Dr. Mazur
during the five weeks between the two psychiatric evaluations he
administered.  After stripping away Dr. Mazur's recommendations
that Hobart continue with the treatment she was already
receiving from other providers at Genesis, his treatment of
Hobart appears to have been limited to admitting her into a drug
trial.  Thus, Dr. Mazur was not in a position to provide the
"detailed, longitudinal picture" or "unique perspective" that
inspired the establishment of the so-called treating-physician
rule.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).
Rather, at the time he rendered his opinion, Dr. Mazur had a
relationship with Hobart that was not much more extensive than
the relationship Dr. Burnette had with her when he rendered his
opinion.  To be sure, Hobart received substantial treatment from
other providers at Genesis both before and after Dr. Mazur
issued his opinion, but the treatment others provided is not a
part of Dr. Mazur's treatment relationship with Hobart.

     The ALJ found that Dr. Mazur's contemporaneous treatment
records failed to support his opinion.  Given the paucity of

---

[15] Moreover, the record includes only one other document
generated by Dr. Mazur, a psychiatric assessment based on a
March 10, 2009, office visit, which appears to have been a
follow-up on the antidepressant drug trial in which Mazur was
participating.  Dr. Mazur's plan called for Hobart to follow up
two months later with a nurse practitioner.  See Tr. 573.

such records, it is difficult to gainsay the ALJ's conclusion.
In the only medical record authored by Dr. Mazur that pre-dates
the opinion at issue, i.e., his first psychological evaluation,
he reported the results of his mental status exam:

> Alert, oriented x3, neatly and casually groomed,
> pleasant and polite.  She describes recurrent sad mood
> with occasional crying and feels that without any
> antidepressant her mood is definitely despondent.
> There is no thought disorder and no hallucinations.
> Short- and long-term memory, fund of knowledge,
> cognition, judgment, and insight present intact.  She
> is non-suicidal and non-homicidal.  She is able to
> benefit/risk review a number of different
> antidepressants and finally we agree to revisit
> fluoxetine, which she found helpful about 10 years
> ago.

Tr. 344.  That finding does not seem especially supportive of
the dire appraisal of Hobart's functional capacity that Dr.
Mazur gave five weeks later.

Moreover, assuming that Dr. Mazur's second psychiatric
evaluation also qualifies as a treatment record – it does
include a section devoted to treatment recommendations – that
evaluation provides only modest support for Dr. Mazur's opinion.
Each of Dr. Mazur's four functional-loss ratings is followed by
a narrative explanation, which is a good thing.  See 20 C.F.R.
§§ 404.1527(d)(3) and 416.927(d)(3).  The problem is that those
narratives rely more on Hobart's subjective reports to Dr. Mazur
than they rely on Dr. Mazur's own observations or clinical
findings.  See Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D.

Mass. 2003) (endorsing ALJ's decision to give slight weight to
treating physician's opinions which were "for the most part,
based on [the claimant's] own descriptions of pain and lack[ed]
objective medical findings").  Beyond that, two of Dr. Mazur's
explanations rely almost exclusively on events or conditions
about which he could only have secondhand knowledge, because
they pre-dated his treatment relationship with Hobart.[16]  Having
examined both of Dr. Mazur's psychiatric evaluations, the court
concludes that the ALJ's principal reason for assigning little
weight to Dr. Mazur's opinion, the lack of support for that
opinion in Dr. Mazur's treatment records, is supported by
substantial evidence.

     The primary thrust of Hobart's argument against the ALJ's
unfavorable appraisal of Dr. Mazur's opinion is that opinion's
consistency with the record as a whole and, in particular, the
Genesis treatment records.  Hobart supports her argument by

---

[16] In support of his determination that Hobart had
"constant" functional loss in the area of task performance, Dr.
Mazur stated: "So depressed past 2 years that unable to conceive
work-site toleration, no less efficacy."  Tr. 489.  When he
wrote that, Dr. Mazur had only been seeing Hobart for five
weeks.  In support of his determination that Hobart had
"repeated" functional loss in the area of stress reaction, he
stated: "Serial job terminations related to depression-
interference to function @ worksite (crying, irritability, very
low frustration tolerance, interpersonal peer conflicts)."  Id.
Dr. Mazur's statement post-dated Hobart's most recent employment
by approximately twenty-two months.  Moreover, those job
terminations occurred before two significant changes in Hobart's
life, her sobriety and her treatment at Genesis.

identifying multiple excerpts from her treatment records that, in her view, are consistent with Dr. Mazur's opinion.  The problem with Hobart's approach is that her Genesis treatment records also contain numerous bits of information that cut the other way, documenting progress Hobart had made with her therapy and demonstrating, among other things, her ability to manage a rather full weekly schedule.  Given that Hobart's record of treatment at Genesis contains evidence of ups and downs, of successes and failures, that record has elements that are consistent with Dr. Mazur's opinion and elements that are consistent with Dr. Burnette's opinion.  Accordingly, the consistency factor is much closer to standing in equipoise than providing support for Hobart's criticism of the ALJ's decision. In such a circumstance, it is not the court's role to substitute its judgment for that of the ALJ.  See Tsarelka, 842 F.2d at 535.

To conclude, the relevant regulations obligated the ALJ to give an explanation for the weight he gave to Dr. Mazur's opinion that was clear and specific, see Kenerson, 2011 WL 1981609, at *4, that was supportable, see Soto—Cedeño, 380 F. App'x at 4, and that offered a rationale that could be accepted by a reasonable mind, see Lema, 2011 WL 1155195, at *4.  The ALJ did exactly that.

c. Ms. Bean's Opinion

In his decision, the ALJ indicated that he gave careful consideration to Ms. Bean's mental RFC assessment, but was not persuaded by it, because it "is conclusory in nature, fails to give disabling limitations and is an assessment of the claimant's ability to engage in basic work like activities, which is an opinion reserved to the Commissioner."[17]  Tr. 19. The ALJ also noted that "Ms. Bean's conclusions are not supported by the claimant's longitudinal treatment record."  Id. In response, Hobart acknowledges that Ms. Bean is not an acceptable medical source.  See 20 C.F.R. §§ 404.1513(a) and 416.927(a) (explaining who qualifies as an acceptable medical source); §§ 404.1527(a)(2) and 416.927(a)(2) (explaining that "medical opinions" are opinions from acceptable medical sources).  Even so, Hobart argues that the ALJ erred by discounting Ms. Bean's opinion.  As the court has already

---

[17] The ALJ's third reason for discounting Ms. Bean's opinions is suspect.  Opinions reserved to the commissioner include: (1) whether a claimant is disabled; see 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1); (2) whether a claimant's impairment meets or equals a listed impairment, see §§ 404.1527(e)(2) and 416.927(e)(2); (3) what a claimant's RFC is, see id.; and (4) how to apply the vocational factors, see id. While a claimant's RFC is for the Commissioner to determine, a claimant's ability to engage in basic work-like activities seems more like an evidentiary building block from which an RFC assessment is constructed than a legal conclusion reserved to the Commissioner.  Because the ALJ gave at least one good reason for discounting Ms. Bean's opinion, this apparent slip-up is immaterial.

pointed out, Hobart's substantive arguments concerning Dr.
Mazur's opinion and Ms. Bean's opinion are essentially merged
into a single argument.  The Commissioner contends that the ALJ
properly gave Ms. Bean's opinion little weight because it was
inconsistent with other evidence in the record such as evidence
that Hobart's symptoms were well controlled with medication.

Turning first to the consistency of Ms. Bean's opinion with
the record as a whole, the court's discussion of that factor in
the context of Dr. Mazur's opinion applies with equal force
here.  Moreover, as the Commissioner correctly notes, where the
record itself includes inconsistent or contradictory evidence,
such as evidence both supporting and undermining Ms. Bean's
opinion, resolution of those evidentiary conflicts is for the
ALJ, not the courts.  See Irlanda Ortiz, 955 F.2d at 769.

In addition to noting the inconsistencies between Ms.
Bean's opinion and the record as a whole, the ALJ also based his
decision on the conclusory nature of Ms. Bean's opinion.  That
is a valid criticism of Ms. Bean's opinion.  The mental RFC
assessment form Ms. Bean filled out asked her to provide a
"[d]etailed explanation of the degree of limitation" for each of
the four categories addressed on the form.  Ms. Bean, however,
offered no explanation at all for the conclusions she reported.
That is, she "present[ed] [no] relevant evidence to support

[her] opinion," and, thus, provided none of the "medical signs and laboratory findings," that entitle a treating-source opinion to increased weight.  See 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3).

The one explanation Ms. Bean did provide was her description of how she and Hobart worked together to complete the form.  While the ALJ did not identify that as a problem, he would have been on solid ground if he had.  See Reeves, 263 F. Supp. 2d at 161.  But, because the ALJ did not identify Ms. Bean's reliance on Hobart's subjective description of her condition as a rationale for discounting Ms. Bean's opinion, the court does not rely on it.  See High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6 (D.N.H. Mar. 17, 2011); Dube v. Astrue, No. 1:10-cv-179-JL, 2011 WL 742520, at *6 n.15 (D.N.H. Feb. 24, 2011); Laplume v. Astrue, No. 08-cv-476-PB, 2009 WL 2242680, at *6 n.20 (D.N.H. July 24, 2009) ("I cannot uphold the ALJ's decision based on rationales unarticulated in the record.").

The bottom line is this.  As with his appraisal of Dr. Mazur's opinion, the ALJ provided a specific, supportable, and reasonable explanation for his decision to give little weight to Ms. Bean's opinion.

d. Dr. Burnette's Opinion

The gravamen of Hobart's objection to the ALJ's decision is that he gave too little weight to the opinions of Dr. Mazur and Ms. Bean, not that he gave too much weight to the opinion of Dr. Burnette; her only real criticism of Dr. Burnette's opinion is that he saw her only once.  Because the court does not agree with Hobart's arguments concerning the opinions on which she relies, there is no need to devote much attention to the ALJ's consideration of Dr. Burnette's opinion other than to register general approval.  The ALJ provided a comprehensive and persuasive explanation for his decision to give great weight to Dr. Burnette's opinion, in conformance with his obligations under 20 C.F.R. §§ 404.1527(b) & (d) and 416.927(b) & (d).  Dr. Burnette's opinion, in turn, includes substantial narrative support for the conclusions it reports, which enhances its supportability.[18]  See 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3).  Thus, the ALJ's decision to credit Dr. Burnette's opinion is supported by substantial evidence.

---

[18] Like Dr. Mazur, Dr. Burnette incorporated Hobart's subjective reports into the explanations he gave for his functional capacity assessments.  Dr. Burnette, however, was an examining source, not a treating source presumed to have access to special knowledge developed over the course of a treatment relationship.  In any event, the subjective reports that Dr. Burnette incorporated into his explanations, on the whole, tend to be somewhat more contemporaneous than the ones that Dr. Mazur incorporated into his explanations.

### e. Summary

Hobart's only argument against the ALJ's RFC assessment is that he failed to give adequate weight to the opinions of Dr. Mazur and Ms. Bean.  In so arguing, she relies largely on the consistencies between those opinions and the evidence in her Genesis treatment records.  But, as the court has explained, the consistency factor is nearly in balance; there is about as much evidence in Hobart's treatment records supporting Dr. Burnette's opinion as there is evidence supporting the opinions of Dr. Mazur and Ms. Bean.  Where, as here, an ALJ offers a sound basis for assigning weight to conflicting opinion evidence, that determination lies within his sound discretion.  See Irlanda Ortiz, 955 F.2d at 769.  That the evidence might have supported an assignment of somewhat greater weight to the opinions on which Hobart relies does not mean that the ALJ erred in his assessment of those opinions.  See Tsarelka, 842 F.2d at 535. In sum, because the ALJ's assessment of the three opinions at issue is supported by substantial evidence, so, too, is his RFC assessment.

### 2. Step-Five Determination

Hobart argues that the ALJ also erred at step five of the sequential analysis because his reliance on a flawed RFC caused him to use the medical-vocational guidelines rather than

eliciting testimony from a vocational expert, as would have been
required if he had found more serious limitations to her RFC.
Because the court has identified no error in the ALJ's RFC
assessment, Hobart's step-five argument necessarily fails.

### Conclusion

Because the ALJ has committed neither a legal nor a factual
error in evaluating Hobart's claim, see Manso-Pizarro, 76 F.3d
at 16, I recommend that: (1) Hobart's motion for an order
reversing the Commissioner's decision, document no. 10, be
denied; and (2) the Commissioner's motion for an order affirming
his decision, document no. 13, be granted.

Any objections to this Report and Recommendation must be
filed within fourteen days of receipt of this notice.  See Fed.
R. Civ. P. 72(b)(2).  Failure to file objections within the
specified time waives the right to appeal the district court's
order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57
(1st Cir. 2011), cert. denied, ___ U.S. ___, 2010 WL 33578 (Jan.
9, 2012), (citing United States v. Lugo Guerrero, 524 F.3d 5, 14
(1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co.,
617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by
objections to magistrate judge's report are subject to review by

district court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge


February 9, 2012

cc:  Bennett B. Mortell, Esq.
     Robert J. Rabuck, Esq.